FILED

2012 Sep-27  PM 02:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN KRIS MORRIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. 2:11-cv-0053-SLB** |
| | } | |
| **PRECOAT METALS, a division of** | } | |
| **SEQUA CORPORATION, a** | } | |
| **Delaware Corporation,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

### <u>MEMORANDUM OPINION</u>

The case is currently before the court on defendant Precoat Metals' ("Precoat"), a division of Sequa Corporation, ("Sequa") Motion for Summary Judgment, (doc. 34).[1]  In his Complaint, (doc. 1), plaintiff John Kris Morris ("Morris") asserts the following claims against Precoat: (1) discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.,[2] (2) termination of employment on the basis of disability in violation of the ADA, (3) retaliation in violation of the ADA, and (4) negligence under Alabama state law.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2]  Morris in fact alleges claims under the Americans with Disabilities Act of 1990. as amended, 42 U.S.C. § 12101, ("ADAAA"), (doc. 1 ¶ 1), but whether pre-ADAAA law or post-ADAAA law governs this case is a point of contention between the parties.

Precoat's Motion for Summary Judgment, (doc. 34), is due to be granted with respect to all claims.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state

that the non-moving party cannot meet its burden at trial."). Moreover, absent other corroborating evidence, a plaintiff's conclusory, unsupported allegations may be discounted. *See Bennett v. Parker*, 898 F.2d 1530, 1533-34 (11th Cir. 1990).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Therefore, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Therefore, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

3

## II.  STATEMENT OF FACTS[3]

**Background**

Several years before he started working for defendant Precoat, plaintiff Morris underwent brain surgery because of a condition he had known as Arnold-Chiari malformation, which caused him to have severe headaches.  (Doc. 38-2 ¶ 12, Morris Aff.) After the operation, Morris's physician, Dr. Rampulla, prescribed Methadone to help control both fluid buildup on his brain and headaches.  (*Id.* at ¶ 13.)  Methadone is a medication that is often used to treat recovering drug addicts.  (Doc. 50 at 8.)  Later, on or about July 17, 2007, Precoat hired Morris as a coater operator at its Birmingham, Alabama, facility.  (Doc. 34-3 ¶ 3, Louie Aff.)  When he was hired, Morris was required to submit a hair and a urine sample pursuant to Precoat's drug testing policy.  (*Id.*)  At this point, he had been taking Methadone for several years, and he continued to take it while he was employed at Precoat. (Doc. 38-2 ¶¶ 14-15, Morris Aff.)[4]  During Morris's time at Precoat, he was considered reliable, a hard worker, and a qualified employee.  (Doc. 38-8 at 37, 44, 63, Birnmann Depo.; doc. 38-16, June 21, 2008, E-mail.)  He never had any problems, with the exception of some

---

[3]  As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to Morris, the nonmoving party.  *See, e.g.*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted)).

[4]  The parties have not indicated whether Methadone ever showed up in this drug test, nor whether Methadone is even detected in the drug tests that Precoat uses.  However, Rob Nemeth testified that the tests are only for "illegal drugs."  (Doc. 38-3 at 19-20, Nemeth Depo.)

attendance issues.  (Doc. 34-12 at 205-06, Louie Depo.; doc. 34-21 at 32-33, Christopher Depo.; doc. 34-2, Unsigned Employee Warning Form.)

**Coater Operator Job Requirements**

Precoat is in the business of applying decorative and protective coatings to steel and aluminum.  (Doc. 34-3 ¶ 2, Louie Aff.)  Morris's primary duties as a coater operator at Precoat included topcoat application and roll changes, (doc. 38-8 at 43-45, Birnmann Depo), which Morris characterizes as "mix[ing] paint and pour[ing] it into a machine."  (Doc. 50 at 8.) However, while these may have been Morris's primary duties, there are several additional duties listed in Precoat's Coater Operator Job Description, including operating "complex equipment."  (Doc. 34-8 at 1, Coater Operator Job Description.)  The Job Description also states that the position includes some "[c]ritical [d]emands" such as "[h]and, eye and feet coordination to operate fork trucks," "[s]quat[ing], kneel[ing] or stoop[ing] frequently to perform job duties," "[f]requently lift[ing] and carry[ing] up to 50 pounds," "[w]alk[ing] or stand[ing] for extended periods of time," and "[s]tamina to work in extreme temperatures," among others.  (*Id.* at 2.)

Next, the Job Description lists the tools and equipment which may be used on the job, some of which include "[f]ork trucks, propane and electric," "[s]hears and knives," and "personal protective equipment."  (*Id.* at 2-3.) Morris testified that Precoat's job description was accurate, with the exception of the requirement that he regularly use a crane and a

forklift. (Doc. 34-4 at 111-13, Morris Depo.) However, he did note that he still operated a forklift once or twice a week. (*Id.* at 113.) Morris agreed that his position could be dangerous and admitted that he believed Precoat was concerned about both his safety and the safety of other employees. (*Id.* at 171.)

In addition to all of these requirements, the Job Description notes that the work environment involves "[p]eriodic exposure to fumes from paints and chemicals used in coating processes." (Doc. 34-8 at 3, Coater Operator Job Description.) Morris claimed that the fumes in the area where he worked were substantial. (Doc. 34-4 at 31-32, Morris Depo.) Morris's supervisor, Lothar Birnmann ("Birnmann"), who worked for Precoat as a production foreman responsible for several employees, testified that one could smell the fumes, but that they were not strong and were controlled by air circulation fans and periodic testing. (Doc. 38-8 at 19-20, Birnmann Depo.) He also had never heard of the fume levels being too high, nor had he heard any complaints from employees about the fumes. (*Id.* at 20-21.)

**June 12, 2008, Incident Requiring Morris's First Drug Test**

On June 12, 2008, Morris came into work and was reported by other employees to be confused, while swaying and shouting. (Doc. 34-15, Recording Form Observed Behavior Determining Reasonable Cause; doc. 34-16, Rob Nemeth's June 13, 2008, Notes.) Morris later claimed that he had not been swaying or shouting, but agreed that he had been confused.

(Doc. 34-4 at 109, Morris Depo.)  Because of this incident, Birnmann called Rob Nemeth ("Nemeth"), the production manager, and told him that "several employees" witnessed Morris "walking unstable, slurred speech, eyes closing, sometimes falling a sleep [sic]." (Doc. 34-16, Rob Nemeth's June 13, 2008, Notes).   Birnmann sent Morris home in accordance with Nemeth's instructions and directed him to return the next day in order to talk to Nemeth.  (*Id.*; doc. 38-8 at 25, Birnmann Depo.)

The next morning, June 13, 2008, Birnmann filled out a report describing Morris's behavior as "confused," "swaying," and "shouting," (doc. 34-15, Recording Form Observed Behavior Determining Reasonable Cause), and attended a meeting along with Nemeth, Morris, and Chip Bartlett ("Bartlett"), the environmental health and safety coordinator. (Doc. 34-16, Rob Nemeth's June 13, 2008, Notes; doc. 34-11 at 32, Louie Depo.)  Despite this initial report on Morris, Birnmann testified in his deposition that Morris's behavior had been "a little out of the ordinary," but that he had not seemed confused nor had he been shouting at anyone in particular, though he was "a little bit loud."  (Doc. 38-8 at 23-24, Birnmann Depo.) However, Birnmann also testified that he sent Morris home out of concern for his safety because of his unusual behavior, (*id.* at 25), and further stated that anything he had ultimately reported to management he would have "consider[ed] serious," (*id.* at 29). Morris later testified that Birnmann told him another employee had come to Birnmann about three months prior to the June 12, 2008, incident, claiming Morris had looked tired and was

"walking funny." (Doc. 34-4 at 32-33, Morris Depo.) However, Birnmann told Morris he

had not felt the need to report it at that time. (*Id.*)

At the June 13, 2008, meeting, Nemeth explained to Morris that he had to take action

to ensure that neither Morris's nor any other employee's safety was in jeopardy. (Doc. 34-16,

Rob Nemeth's June 13, 2008, Notes.) Nemeth then told Morris that he would have to take

a drug test, and that he was suspended until the results of the test came back. (*Id.*; doc. 38-3

at 19, Nemeth Depo.) If the results were negative for illegal drugs, Nemeth said that Precoat

would pay Morris for his lost time; if positive, they would "take the next step." (Doc. 34-16,

Rob Nemeth's June 13, 2008, Notes; doc. 38-3 at 19, Nemeth Depo.) Morris has no history

of illegal drug use, (doc. 38-2 ¶ 1-3, Morris Aff.), but he told his supervisors at the meeting

that he had to take medication as a result of his prior brain surgery. (Doc. 34-16, Rob

Nemeth's June 13, 2008, Notes.) However, there is no evidence that he disclosed the exact

medication he was on at the time (i.e., Methadone). (Doc. 34-4 at 17-18, Morris Depo.; doc.

34-16, Rob Nemeth's June 13, 2008, Notes.) In his deposition, he agreed that he did not

specify which medication he was taking until a subsequent meeting on June 25, 2008, but

later stated that he could have told his superiors in the June 13, 2008, meeting. (Doc. 34-4

at 17-18, 144-45, Morris Depo.) Morris did not know whether any other employees at

Precoat knew of his brain surgery or his Methadone use before June 12, 2008, but he did not

recall discussing it with anyone. (Doc. 34-5 at 225, Morris Depo.) He also explained to his

supervisors at the June 13th meeting that he may have looked tired because he had stayed awake to take his daughter to the doctor for two days in a row just prior to June 12, 2008. (Doc. 34-4 at 21-23, Morris Depo.)

On June 13, 2008, Morris went to Concentra Medical Center ("Concentra"), the facility that does Precoat's drug testing. (Doc. 34-11 at 105, 173-74, Louie Depo.) Precoat's official drug policy includes taking both urine samples and hair samples. (Doc. 34-6, Precoat Metals Drug Policy; doc 34-7, April 16, 2004, E-mail; doc. 38-4 at 14, Walton Depo.) Precoat tests hair samples as part of its policy because it reflects drug use over a longer period of time, depending on the length of the hair.  (Doc. 38-4 at 22, Walton Depo.) However, Morris was given only a urine test, and it came out negative for illegal drugs. (Doc. 34-19, Concentra June 13, 2008, Non-Injury Status Report; doc. 34-4 at 24-26, 29, Morris Depo.)  Accordingly, Precoat paid Morris for the day of work that he missed and returned him to work on his regular schedule. (Doc. 34-4 at 27-28, Morris Depo.; doc. 34-16, Rob Nemeth's June 13, 2008, Notes.)  On June 16, 2008, Precoat officially notified Morris that his urine test had come out negative, but it also notified him that a hair sample had been forgotten and needed to be taken. (Doc. 34-4 at 28-29, Morris Depo.; doc. 38-1 at 152, Morris June 30, 2008, Notes.)

The Concentra June 13, 2008, Non-Injury Status Report says "Rapid D/S & Hair Sample Screen," yet only indicates the results of a urine sample.  (Doc. 34-19, Concentra

June 13, 2008, Non-Injury Status Report.)  Beverly Walton ("Walton"), Concentra's Center

Administrator, stated that "Rapid D/S & Hair Sample Screen" could mean that either a rapid

drug screen test or a hair sample test was taken because the description is simply a protocol

name.  (Doc. 38-4 at 50, Walton Depo.)  She stated that from the records she reviewed, it

appeared as though Precoat had only requested a urine test from Morris, (*id.* at 52), but

agreed that Precoat generally requires both a urine and a hair test, (*id.* at 14).  She further

agreed it was possible that Precoat could have requested both, but that a mistake had been

made.  (*Id.* at 54.)  Morris testified that he was never asked for a hair sample on this first visit

to Concentra.  (Doc. 34-4 at 29, Morris Depo.)

### Precoat Requires Morris to Return for a Hair Sample

On June 18, 2008,[5] Bartlett told Morris that Precoat had originally planned for him to

have a hair test and instructed him to return to Concentra after work to have it completed.

(Doc. 34-4 at 30, 34-35, Morris Depo.; doc. 38-1 at 152, Morris June 30, 2008, Notes.)  After

work, instead of going to get a hair sample as instructed, Morris returned home.  (Doc. 34-4

at 35, Morris Depo.)  Both his personal notes from June 30, 2008, and his deposition

_____

[5] Precoat asserts in its Motion for Summary Judgment that this occurred on June 16, 2008, (doc. 34 at 4), while Morris asserts it was June 19, 2008.  (Doc. 50 at 10.)  Based on Morris's deposition and notes, it seems that June 18, 2008, is likely the correct date for when Bartlett affirmatively requested he go to Concentra, though Morris may have been informed of the oversight on June 16, 2008.  (*See* doc. 34-4 at 29-30, Morris Depo.; doc. 38-1 at 152, Morris June 30, 2008, Notes.)  The difference in dates is not material for purposes of determining the motion for summary judgment.

testimony reflect that at this point he started wondering why he was "being harassed." (Doc. 34-4 at 35, Morris Depo.; doc. 38-1 at 153, Morris June 30, 2008, Notes.) On June 19, 2008, and June 20, 2008, Morris was scheduled for work but did not show up. (Doc. 34-4 at 35-38, Morris Depo.; doc. 34-14 at 2, Morris Work Schedule.) There is no indication that he called to inform Precoat he would be missing work, and he could not remember calling, but he stated that he "would have" called someone. (Doc. 34-4 at 35-38, Morris Depo.) Precoat's company policy states that three absences with no call or no show is grounds for termination. (Doc. 34-23 at 20, Precoat Handbook). He claimed that his absences were because he wanted to talk to Nemeth before giving a hair sample; however, he could not because he was told not to return until he had taken the drug test. (Doc. 34-4 at 35-37, Morris Depo.)

On June 20, 2008, Morris was having dinner at a restaurant and ran into Scott Wallace ("Wallace"), a shift supervisor at Precoat. (Doc. 34-4 at 40-42, Morris Depo.) Wallace encouraged Morris to return to work and told him they would set up a meeting with Barlett. (Doc. 34-4 at 41, Morris Depo.; doc. 38-1 at 153, Morris June 30, 2008, Notes.) On June 22, 2008, Morris returned to work. (Doc. 34-4 at 43, Morris Depo.; doc. 34-14 at 2, Morris Work Schedule.) He subsequently met with Bartlett on June 24, 2008, and was sent to Concentra to have a hair test. (Doc. 38-1 at 153, Morris June 30, 2008, Notes.) However, Concentra requires hair samples to be approximately an inch and a half long in order to test them for drugs; if the strands are too short, then a sample cannot be taken. (Doc. 38-4 at 21,

11

Walton Depo.)  Because of the length requirement, Morris had insufficient hair for testing.
(Doc. 34-4 at 58-60, Morris Depo.; doc. 34-24, Concentra June 24, 2008, Non-Injury Status
Report.)   Thereafter, he returned to Precoat, where Bartlett told him to go home and
instructed him to return for a meeting the next day.  (Doc. 34-4 at 61, Morris Depo.)

Morris testified that in the summer months, he keeps his hair short and cuts it about
once every month.  (*Id.* at 68.)  In addition, he explained that he had hair Concentra could
have tested on other areas of his body.  (*Id.* at 63; doc. 38-1 at 153, Morris June 30, 2008,
Notes.)  Walton confirmed that hair samples can indeed be taken from areas other than the
head, but she stated that Concentra's normal procedure would be to look for hair in other
places on the body.  (Doc. 38-4 at 19-20, Walton Depo.)

Precoat alleges that the reason Concentra could not get a hair sample is because
Morris had shaved all the hair off of his body.  (Doc. 34 ¶ 25; doc. 38-9 at 3, Precoat Feb.
24, 2010, Response to EEOC.)  However, Concentra's Non-Injury Status Report only states
that "hair collection canceled" because Morris was "unable to give [a] specimen." (Doc. 34-
24, Concentra June 24, 2008, Non-Injury Status Report; doc. 38-4 at 20, Walton Depo.)  The
only evidence that Morris did perhaps shave his body is in a June 24, 2008, e-mail from
Adriane Louie ("Louie"), Precoat's Regional Human Resources Manager, to several of
Morris's supervisors, where she stated that "[d]ue to the clinic not testing [Morris] for hair
the 1st time around and giving him enough time to shave," Precoat should bring Morris back

to work with the stipulation that he get tested when his hair grows out.  (Doc. 38-21, June 24, 2008, E-mail.)  She further wrote that "[w]e currently don't have a policy that prevents employees from shaving combined with the fact that so much time has passed our case grows weaker by the 2nd."  (*Id.*)  However, Louie stated at her deposition that while she believed it was true Morris had shaved, she did not have personal knowledge of it.  (Doc. 34-11 at 109, Louie Depo.)  Louie also met with Morris the next day on June 25, 2008, but did not notice whether he had shaved all of the hair off of his body.  (Doc. 34-11 at 109-12, Louie Depo.)

In the same June 24, 2008, e-mail from Louie, she recounted suggestions made to her by John Christopher ("Christopher"), Precoat's Human Resource Director, that (1) Precoat should allow Morris to return to work, but he would be required to re-take a hair drug test once his hair grew out; (2) he would be required to disclose the medication he was taking so that the company could discuss it with its doctor to "make sure that he [wasn't] a danger to himself or others"; and (3) another no call/no show would result in termination.  (Doc. 38-21, June 24, 2008, E-mail.)  The e-mail also stated that Christopher "suggests that since Kris has a history of this behavior . . . we will catch him sooner or later."  (*Id.*)  Both Christopher and Louie testified that this was in reference to Morris's attendance problem.  (Doc. 34-21 at 32-33, Christopher Depo.; doc. 34-12 at 220, Louie Depo.)

**June 25, 2008, Meeting and Morris's Last Day at the Precoat Facility**

The next morning, on June 25, 2008, Morris met with three members of Precoat management: Louie, Bartlett, and Birnmann.  (Doc. 34-4 at 45, Morris Depo.)  Morris stated that this meeting was the first time he told anyone at Precoat exactly what medication he was taking.  (*Id.* at 45-46.)  Later, however, he testified that he could not be sure whether he informed Precoat at the June 13, 2008, meeting or at the June 25, 2008, meeting that he was taking Methadone.  (*Id.* at 144-45.)  Morris stated that no one at the meeting asked him what medication he was prescribed as Louie's e-mail had suggested, but that he volunteered the information.  (*Id.* at 67.)  He further testified that no one told him another no call or no show would result in termination, nor did they ask him to return for another hair test once his hair had grown out.  (*Id.*)

At the meeting, Morris gave his supervisors his prescription information and the name of his physician, Dr. Rampulla.  (Doc. 38-1 at 153, Morris June 30, 2008, Notes; doc. 34-4 at 50-51, Morris Depo.)  They told him that Dr. Rampulla would need to review his job description and give his opinion on whether Morris was capable of working as a coater operator at Precoat.  (Doc. 34-4 at 50-51, Morris Depo.; doc. 34-27, July 8, 2008, Letter.)  He was also told to return home until the company contacted its own doctor to be sure he could work safely while taking Methadone.  (Doc. 38-1 at 153-54, Morris June 30, 2008, Notes; doc. 34-4 at 46-47, Morris Depo.; doc. 34-11 at 142, Louie Depo.)  Precoat's

handbook states that the company reserves the right to get an independent opinion from a company-selected physician.  (Doc. 34-23 at 8, Precoat's Handbook.)  In addition, there was substantial testimony by both Precoat employees and Morris himself that Precoat was very concerned with the safety of Morris and other employees if he continued to work while taking Methadone.  (Doc. 38-16, June 21, 2008, E-mail; doc. 34-4 at 171, Morris Depo.; doc. 38-8 at 25, Birnmann Depo.; doc. 34-16, Rob Nemeth's June 13, 2008, Notes; doc. 34-11 at 117, 147-48, 158, Louie Depo.; doc. 34-21 at 48-49, Christopher Depo.)

Though he was being sent home, Morris testified that he was told he would be on paid leave until a decision could be reached regarding his future at Precoat.  (Doc. 34-4 at 46-47, Morris Depo.; doc. 38-1 at 153-54, Morris June 30, 2008, Notes.)  However, he did not recall who told him this, how long he was paid for, or when Precoat stopped paying him.  (Doc. 34-4 at 46-47, Morris Depo.)  Conversely, Louie testified that Morris was not told he would be paid, and in fact, from June 25, 2008, through July 30, 2008, he was not paid by Precoat.  (Doc. 34-11 at 142-43, Louie Depo.)  Morris also testified that on June 25, 2008, he spoke with Bartlett individually, who informed Morris that he disliked the idea of his taking medication, and that had Precoat known, it never would have hired him.  (Doc. 34-4 at 47-48, Morris Depo.; doc. 16-1 at 12, Plaintiff's Response to Defendant's 1st Set of Interrogatories.)  Finally, Morris testified that June 25, 2008, was the first day that he suspected he was being discriminated against for taking Methadone.  (Doc. 34-4 at 50, Morris Depo.)  It was also the

last day he ever spent at the Precoat facility.  (*Id.* at 62.)

On either June 25, 2008, or June 26, 2008, Precoat contacted Dr. Rampulla to inform him that Precoat planned on sending over Morris's job description in order to obtain a work release.  (Doc. 34-27, July 8, 2008, Letter).  Dr. Rampulla's office then called Morris in order to get permission to confer with Precoat's physician so that Morris could be cleared for work.  (Doc. 38-1 at 154, Morris June 30, 2008, Notes; doc. 34-4 at 65-66, Morris Depo.)  From June 25, 2008, until July 16, 2008, Precoat did not hear from Morris or his physician.  (Doc. 39-2, July 16, 2008, E-mail; doc. 34-11 at 151, Louie Depo.)  On July 2, 2008, Bartlett sent an e-mail to Louie and Nemeth observing that they had not heard from Morris and suggesting "it is time to make a move of some kind."  (Doc. 38-22, July 2, 2008, E-mail.)  The same day, Nemeth weighed in on the issue by sending an e-mail to Bartlett and Louie, stating "I want to terminate Chris based on all the facts that [C]hip told me."  (Doc. 38-23, July 2, 2008, E-mail.)  Louie responded, explaining that "John Christopher advised to send him a letter and ask him to respond by a certain day.  If no response then he abandoned his job." (Doc. 38-24, July 2, 2008, E-mail.)

Subsequently, on July 8, 2008, Louie sent a letter to Morris by certified mail recounting the events of the June 25, 2008, meeting and reminding Morris that Precoat had not yet heard from him.  (Doc. 34-27, July 8, 2008, Letter.)  The letter also stated that unless Morris contacted Louie within fifteen days, Precoat would assume he had abandoned his job.

(*Id.*)  Morris received the letter and contacted Louie on July 16, 2008.  (Doc. 39-2, July 16, 2008, E-mail.)  Later that day, Louie e-mailed Morris with the job description for a coater operator in order to get Dr. Rampulla's work release.  (Doc. 34-28, July 16, 2008, E-mail.)  On July 17, 2008, Dr. Rampulla sent a work release to Precoat, stating "Morris is prescribed Methadone for Chronic Pain for over a year.  There is no evidence that patient is mentally or physically impaired or intoxicated due to therapeutic pain medication (Methadone).  Patient is capable to [do] any type of work without limitation."  (Doc. 34-29, July 17, 2008, Physician Release.)  Additionally, Morris e-mailed Louie on July 20, 2008, asking to cash in some vacation time, and expressing that he looked forward to hearing from her on "the other matters concerning my future with Precoat."  (Doc. 39-7, July 20, 2008, E-mail.)

From the July 20, 2008, e-mail until August 22, 2008, there was fairly little contact between Morris and Precoat, though Morris had contacted Louie more than once to follow up.  (Doc. 39-13, Aug. 19, 2008, E-mail.)  On August 19, 2008, Morris sent an e-mail to Louie asking about his job; this was the last written correspondence he sent to her.  (Doc. 34-4 at 88, Morris Depo.; doc. 39-14, Aug. 19, 2008, E-mail.)  Louie testified that in the time period from July 20, 2008, to August 22, 2008, Precoat had to talk to its company physician, Dr. Lupinacci, and get him to confer with Dr. Rampulla, which is why Precoat had not yet brought Morris back to work.  (Doc. 34-11 at 153-55, Louie Depo.; doc. 34-12 at 289, Louie Depo.)

Originally, when Precoat contacted Dr. Lupinacci on August 4, 2008, he had concerns about bringing Morris back because the Department of Transportation ("DOT") has a regulation against drivers taking Methadone. (Doc. 34-30, Aug. 4, 2008, E-mail.) However, because Morris's doctor was the treating physician and had determined that Morris would not be a hazard, Precoat decided to have Dr. Lupinacci call Dr. Rampulla, just to be sure that Morris was able to work safely. (Doc. 39-12, Aug. 5, 2008, E-mail; doc. 34-12 at 333-34, Louie Depo.) There is no real explanation as to why there was a two week time lag, (doc. 34-11 at 153-55; doc. 34-12 at 289-90, Louie Depo.), but on August 19, 2008, Louie sent Morris an e-mail that stated "I have been out of the office so I just received your messages. I will contact our doctor at Concentra tomorrow and ask him to contact your physician." (Doc. 39-13, Aug. 19, 2008, E-mail.) Thereafter, Dr. Lupinacci and Dr. Rampulla consulted, and Dr. Lupinacci confirmed that Morris could return to work. (Doc. 34-12 at 289-90, Louie Depo.)

**August 22, 2008, Letter**

Once she got this confirmation, Louie sent a second letter to Morris on August 22, 2008, indicating that he could return to work and asking him to reply within seven days or Precoat would assume that he had abandoned his job. (Doc. 34-32, Aug. 22, 2008, Letter.)[6]

---

[6] The full letter reads as follows: "Dear Mr. Morris: I received your email on August 19, 2008 concerning your work status. I have your doctor's note releasing you to return back to work. Since you have been away from work 30 days or more you may be required to take a return to work physical but I will find out. Please contact me concerning your future employment with Precoat Metals. Again, if I do not hear from you I will assume that you have abandoned your job. Please contact me within the next seven (7) days." (Doc. 34-32, Aug. 22, 2008, Letter.)

Unlike the earlier letter from July 8, 2008, Louie did not send the August 22, 2008, letter by certified mail.  (Doc. 34-11 at 45-47, Louie Depo.)  However, she stated that she is certain it was mailed because she prepared the letter, put it in an envelope, put postage on it, and put it in the mailbox at the post office herself.  (*Id.* at 43.)  Morris testified that he never received the August 22, 2008, letter and that he had never seen it before initiating a charge of discrimination against Precoat.  (Doc. 34-4 at 92-93, Morris Depo.)  Louie explained that she did not send it by certified mail because the company's protocol is to send letters by regular mail, and she had only sent the earlier July 8, 2008, letter by certified mail to verify Morris's address.  (Doc. 34-11 at 45-47, Louie Depo.)  Because his address was correct, she did not feel the need to send the second letter by certified mail.  (*Id.*)  She could not remember, however, why the decision was made to give Morris only seven days instead of fifteen.  (*Id.* at 44.)  Additionally, Louie stated that in cases of job abandonment, her protocol is to send a letter rather than contact the employee by phone or e-mail.  (Doc. 34-11 at 43-44, 56-57, 74, 83-84.)  Morris never contacted Precoat within his seven day window; as a result, he was terminated.  (Doc. 34-3 ¶ 12, Louie Aff.; doc. 34-11 at 42, Louie Depo.; doc. 34-12 at 297-98, Louie Depo.)

Because Morris never contacted Precoat, Louie stated that he was officially terminated for job abandonment on September 1, 2008.  (Doc. 34-11 at 25, Louie Depo.; doc. 34-12 at 357, Louie Depo.)  Morris's termination record from Precoat's computer system also reflects the date of September 1, 2008.  (Doc. 39-16, Morris Termination Sheet.)  He claims that he

19

called Louie "from time to time" after August 20, 2008, but he was always told she was out of the office.  (Doc. 38-2 ¶ 30, Morris Aff.)  He could not specifically remember a time that he had called her after filing for unemployment on September 14, 2008, but stated he "would have tried to contact her."  (Doc. 34-4 at 148-50, Morris Depo.)

### Morris's September 14, 2008, Application for Unemployment Benefits

On September 14, 2008, Morris filled out an application for unemployment benefits. (Doc. 34-34, Unemployment Benefits Worksheet; doc. 34-4 at 94, Morris Depo.)  He testified that this was because he did not know his status with Precoat and that this date is when he realized he was "out of work."  (Doc. 34-4 at 94-96, Morris Depo.)  However, he further testified that he thought he was out of work "with [the] understanding that [he] would soon be brought back to work."  (*Id.* at 95.)  Moreover, he stated in his Affidavit that he did not think he had been fired from Precoat at this time, and that as he understood it, a person could file for unemployment with the State of Alabama "if [they] were not working."  (Doc. 38-2 ¶¶ 28-29, Morris Aff.)  Morris received unemployment compensation from the State of Alabama from approximately September of 2008 until March of 2009.  (Doc. 34-4 at 100-01, Morris Depo.; doc. 34-34, Unemployment Benefits Worksheet.)  He believed as of September 14, 2008, that Precoat had treated him unfairly in not letting him return to work because he was on Methadone.  (Doc. 34-4 at 97-100, Morris Depo.)

Despite the fact that Precoat allegedly terminated Morris on September 1, 2008, he continued to receive health insurance benefits.  (Doc. 34-12 at 358-59, Louie Depo.; doc. 38-

20

2 ¶¶ 32-33.)  Moreover, in January of 2009, he received a new insurance card.  (Doc. 39-19, Morris Insurance Card; doc. 38-2 ¶ 32, Morris Aff.)  However, during an end-of-the-year audit, Precoat discovered it was erroneously providing health benefits for Morris, along with a few other employees.  (Doc. 34-12 at 359, Louie Depo.)  Louie then canceled Morris's benefits (along with the other employees) on January 30, 2009, and made the cancellation retroactive so that it was effective starting January 1, 2009.  (Doc. 39-17, Insurance Termination Form; doc. 34-12 at 369-70, Louie Depo.)  Though Morris's termination is reflected in Precoat's computer system as September 1, 2008, his termination sheet does not reflect the date it was entered into the computer, while the termination records of other employees (Ryan Kent, Anthony Prentice, Andra Rembert, and Shannon Undria) do reflect the date of entry.  (Doc. 39-8, Termination Sheets.)  Morris claims that these are the other employees who also retained insurance benefits after their alleged terminations.  (Doc. 50 at 20-21.)[7]  However, Precoat produced insurance cancellation forms and terminations sheets for the employees it contends continued to erroneously remain as covered employees on Precoat's policy.  (Doc. 34-36, Cancellation of Health Insurance Forms; doc. 34-35, Termination Sheets.)  Precoat says these employees are Earnest Leavigne, Jr., James Roger Wesson, and Demarco Stoudmire.  (Doc. 34-36, Cancellation of Health Insurance Forms.)

---

[7]  At oral argument, Precoat's counsel stated that the termination sheets Morris produced were actually from other employees who had been terminated for job abandonment, not other employees who had inadvertently retained insurance benefits.

Morris did not make any payments on his health insurance after September 1, 2008. (Doc. 34-5 at 212, Morris Depo.)  He explained that he did not think this was unusual because he believed he was waiting on Precoat's decision regarding whether he could return to work.  (*Id.*)  In February of 2009, Morris attempted to fill a prescription, and his health insurance was declined.  (Doc. 34-4 at 172, Morris Depo.; doc. 34-5 at 228-29, Morris Depo.)  He then called Louie, who informed him that he had been terminated as a "no call no show." (Doc. 34-4 at 172, Morris Depo.)  Neither party pointed the court to any evidence in the record indicating whether Morris used his insurance between September 1, 2008, and when it was declined in February of 2009.

On February 17, 2009, Morris first went to see an attorney about his situation with Precoat.  (Doc. 38-2 ¶ 38, Morris Aff.)  One day later, on February 18, 2009, he was in a serious car accident and hospitalized.  (*Id.* ¶¶ 39-40.)  Morris first claimed he was in the hospital for six weeks, (*id.* ¶ 40), but later agreed he was in the hospital for only twelve days, (doc. 34-4 at 125, Morris Depo.)  On April 3, 2009, he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Doc. 38-2 ¶ 41, Morris Aff.; doc. 34-38, EEOC Charge of Discrimination.)  He never made use of Precoat's internal dispute resolution procedures to help determine whether he could return to work.  (Doc. 34-4 at 188-90, Morris Depo.)

22

### III. DISCUSSION

#### A.  EEOC Filing Requirement Under the ADA

Morris claims that he was forced to take an unnecessary leave of absence due to a perceived disability, was not allowed to return to work, was terminated on the basis of a perceived disability, and was retaliated against, all in violation of the ADA.  (Doc. 1 ¶ 54-56.)  In order to bring any civil action under the ADA, a plaintiff must first file a grievance with the EEOC within 180 days of the alleged discrimination.  *See Brewer v. Alabama*, 111 F. Supp. 2d 1197, 1204 (M.D. Ala. 2000); *see also Carter v. Univ. of S. Ala. Children's & Women's Hosp.*, 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007) ("In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act.").[8]  The ADA has incorporated this administrative prerequisite from Title VII.  *See* 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides . . . ."); 42 U.S.C. § 2000e–5(e).  Once the EEOC has concluded its investigation, a plaintiff must file suit in the district court within ninety (90) days of issuance of the right-to-sue notice.  § 2000e–5(f).

---

[8]  Though *Carter* is a Title VII case, "[c]ases interpreting Title VII are relevant to our analysis of the ADA because the ADA is essentially a sibling statute of Title VII." *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 606 (3d Cir. 1998); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

In order for a plaintiff's 180-day window to start running, he must receive "unequivocal notice of the adverse employment decision." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996); *see also Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("[T]he filing limitations periods . . . commenced [when] the tenure decision was made and communicated to Ricks."); *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1201 (11th Cir. 2003) ("[T]he 180-day period is counted from the date the employee receives *notice* of termination." (quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561 (11th Cir. 1987))).  It is not enough that "an employee is left simply to infer and deduce his employment status from the surrounding events." *Wright*, 320 F.3d at 1203.  Accordingly, a plaintiff who "may have had reason . . . to suspect that she *might* be terminated . . . was not enough to start the charge filing period running." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000).  Ultimately, an employee must have unequivocal notice of the adverse employment action—meaning he must know, for example, that he is being terminated, placed on leave, or forced to resign—and must be aware of possible discriminatory motive (otherwise, equitable tolling becomes permissible). *See Brewer*, 111 F. Supp. 2d at 1205 (noting that the Supreme Court has explained that the act of termination itself is not illegal, but that it is the "improper motive" in the decision to terminate that is illegal).

Precoat asserts that the Eleventh Circuit has held the 180-day period for filing with the EEOC begins when the complainant knows or reasonably should have known that the

24

discriminatory act has occurred.  (Doc. 34 at 18.)  Therefore, the argument goes, Morris knew or should have been aware of any discriminatory or retaliatory acts by Precoat by at least September 14, 2008, the date that he applied for unemployment benefits with the State of Alabama.  (*Id.* at 18-20.)  Thus, Precoat asserts that Morris's claims are time-barred because he did not meet the 180-day EEOC filing requirement: Morris filed with the EEOC on April 3, 2009, which means that any acts occurring before October 5, 2008 (180 days before), would be time-barred.  (*Id.* at 18.)

In support of its proposition, Precoat cites *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994), an Eleventh Circuit case where the court stated that the 180-day limitations period does not start to run until "the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights."  However, in *Wright v. AmSouth Bancorporation*, the Eleventh Circuit later made it clear that *Sturniolo* was an equitable tolling case where the plaintiff had no knowledge of the alleged discrimination until several months after his discharge.  *Wright*, 320 F.3d at 1202.  The court applied a "knows or has reason to know" standard, but stated that "[t]his test for equitable tolling of the filing period is a different idea from establishing the starting point of the 180-day filing period, which relies on *unequivocal communication* of the adverse employment decision."  *Id.* (emphasis added).  Thus, the 180-day period does not begin when Morris knew or had reason to know of any adverse employment action; rather, Morris's contention that the 180-day period starts when he had unequivocal notice of

any alleged adverse employment action is the correct standard.

Given that the 180-day time limit began when Morris had unequivocal notice of any adverse action, the court must next determine what, exactly, the adverse action is that Morris alleges under the ADA.  As listed above, it appears that Morris alleges four separate violations in his Complaint:  He was forced to take an unnecessary leave of absence, not allowed to return to work, terminated on the basis of a perceived disability, and retaliated against, all in violation of the ADA.  (Doc. 1 ¶¶ 54-56).[9]  Even construing these allegations liberally, they can at most be said to allege three adverse employment actions: (1) unnecessary leave of absence; (2) termination; and (3) retaliation.[10]  The failure to permit Morris to return to work is encompassed in either the unnecessary leave of absence or his ultimate termination (most likely the latter, given that the failure to permit him to return to work became factually accurate upon his actual termination).[11]  Because the court has decided that Morris only alleges three possible claims under the ADA, they will be analyzed under the applicable "unequivocal notice" standard discussed in *Wright* to determine whether they are time-barred.  *See* 320 F.3d at 1202.  However, because Morris's retaliation claim

_____

[9]  As discussed later, in his Opposition brief Morris also appears to attempt to add a "failure to accommodate" claim under the ADA, (doc. 50 at 36-37); but even under a liberal reading, this claim cannot be said to have been included within in his Complaint.

[10]  Morris includes the discrimination claims as well as the separate retaliation claim all within one count in his Complaint, making it difficult to sort out his claims.  (Doc. 1 ¶¶ 54-56.)

[11]  Courts have not often treated the failure to permit an employee to return to a position as independent discriminatory action.  *See, e.g.*, *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 763-64 (11th Cir. 1995) (failure to rehire claim was not a new and discrete act of discrimination, separate from the original charge of discriminatory discharge).

clearly fails for other reasons, the court will not address it under this threshold question.

### 1.  Unnecessary Medical Leave Claim

First, Morris claims that Precoat violated the ADA by forcing him to take "an unnecessary leave of absence due to a perceived disability." (Doc. 1 ¶ 54.)  Claims based on a forced leave are often pled as claims of retaliation or failure to accommodate under the ADA.  *See, e.g.*, *Knight v. Computer Sciences Raytheon,* 2002 WL 32818520, at *14 (M.D. Fla. 2002) (noting that "being placed on unpaid suspension and unpaid medical leave can be considered adverse employment actions" for purposes of a retaliation claim); *Katch v. Fifth Third Bancorp*, 07-14821-BC, 2009 WL 152147, at *9 (E.D. Mich. Jan. 21, 2009) *amended on reconsideration in part*, 07-14821BC, 2009 WL 1140282 (E.D. Mich. Apr. 28, 2009) ("Plaintiff alleges that Defendant violated the ADA when it failed to accommodate her restrictions and 'forced' her to take a leave of absence . . . .").  Yet, there seems to be no reason why a claim based on a forced leave of absence could not also be brought as a general disability discrimination claim in violation of 42 U.S.C. § 12112(a).  *See Gilbert v. MetLife, Inc.*, CIV. 09-1990 JRT/JSM, 2011 WL 1843441, at *12 n.7 (D. Minn. Mar. 14, 2011) (observing that there is an intersection between termination/failure to hire claims and failure to accommodate claims in the context of the ADA).

Nevertheless, even if it can be brought as an individual claim, this instance of alleged discrimination is time-barred because Morris did not file with the EEOC within 180 days after he had unequivocal notice of Precoat's actions.  There was testimony from both parties

that Morris was sent home after the June 25, 2008, meeting with Precoat supervisors. (Doc. 34-4 at 46-47, Morris Depo.; doc. 34-11 at 142, Louie Depo.) Therefore, Morris certainly had notice that he was being required to take a leave of absence because Precoat wanted to clear his Methadone use with its physician. (Doc. 34-4 at 46-47, Morris Depo.; doc. 34-11 at 142, Louie Depo.) Moreover, Morris testified that June 25, 2008, was the first time he suspected he was being treated differently because of his Methadone prescription. (Doc. 34-4 at 50, Morris Depo.) Finally, Morris testified that on June 25, 2008, Bartlett told Morris that he disliked the idea of his taking medication, and that if Precoat had known, it never would have hired him. (Doc. 34-4 at 47-48, Morris Depo.; doc. 16-1 at 12, Plaintiff's Response to Defendant's 1st Set of Interrogatories.)

Given that Morris could have had no doubt he was being placed on leave, the court finds as a matter of law that Morris had unequivocal notice of his required leave as of June 25, 2008. *See e.g.*, *Brewer*, 111 F. Supp. 2d at 1205 (holding that the relevant date an ADA claim accrued was when "[b]y her own admissions" the plaintiff knew she would not be able to rescind her resignation). Thus, because Morris knew he was being placed on leave and believed he was being discriminated against at the time, *see id.*, he had 180 days from June 25, 2008, to file a claim for being required to take leave from Precoat. This 180-day window ended on December 22, 2008. Morris did not file his charge with the EEOC until April 3, 2009; as such, his claim of discrimination as to unnecessary medical leave (if it is indeed a separate claim) is time-barred. Though Morris also advances several equitable tolling

28

arguments, for reasons stated below, in addition to the applicable two-year statute of limitations, the court finds them unpersuasive.[12]

### 2. Termination Claim

Morris's second claim of discrimination under the ADA, based on his eventual termination, seems to be the real focus of his lawsuit.  Though "when the discriminatory act occurs . . . is a question of fact," *Lever v. Nw. Univ.*, 979 F.2d 552, 553 (7th Cir. 1992), the alleged adverse employment action is typically evident to the employee, and so it is a simple task to determine when the clock begins ticking.  *See, e.g.*, *Jordan v. City of Montgomery*, 283 F. App'x 766, 768 (11th Cir. 2008) (noting that though the plaintiff disputed the timeliness of his EEOC charge, he did not dispute the fact that he had notice of the adverse employment decision).  In this case, however, Morris claims that he did not receive notice of his termination until February 2009, when he called Louie to find out why his health insurance had been canceled.  (Doc. 50 at 19; doc. 34-5 at 228-29, Morris Depo.) Conversely, Precoat asserts that because Morris did not attend work after June 25, 2008, combined with his application for unemployment benefits on September 14, 2008, he was

---

[12]  Morris also asserts that none of his claims should be time-barred because they are a continuing violation.  (Doc. 50 at 31.)  However, the court finds that all of the actions alleged are separate and discrete instances of conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."). Moreover, because all of the alleged discriminatory acts are time-barred, they cannot help to establish a continuing violation since they did not occur within the statutory period.  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (11th Cir. 1998) ("[P]laintiffs may not use time-barred discriminatory acts to help establish a *prima facie* case of discrimination.").

on "reasonable notice" that he was subjected to an adverse employment action "either in the form of actual or constructive discharge." (Doc. 34 at 19.) Though the law is unequivocal notice and not "reasonable notice," *see Grayson*, 79 F.3d at 1100 n.19, the court finds as a matter of law that given the evidence, Morris did have unequivocal notice of his termination as of September 14, 2008. Therefore, his discriminatory termination claim is time-barred.

First, Morris stated in his deposition that he believed Precoat had treated him unfairly as of September 14, 2008, indicating at least some modicum of awareness as to the state of things. (Doc. 34-4 at 97-100, Morris Depo.; doc. 34-34, Unemployment Benefits Worksheet.) But this alone is not enough. Here, in addition to his stated knowledge of unfair treatment, Morris stopped paying his required health insurance premiums, (doc. 34-5 at 212, Morris Depo.), he cannot say for sure that he contacted Precoat after filing for unemployment benefits, (doc. 34-4 at 148-50, Morris Depo.), and he failed to use Precoat's internal dispute resolution procedures, though he supposedly believed he was still employed there. (Doc. 34-4 at 188-90, Morris Depo.) Finally, on top of all of this, Morris filed for unemployment benefits on September 14, 2008. (Doc. 34-34, Unemployment Benefits Worksheet; doc. 34-4 at 94, Morris Depo.) Regardless of whether Morris actually received the August 22, 2008, letter, as Precoat observes, his behavior was indicative of someone who had recently been terminated. (Doc. 51 at 3.)

Though the "unequivocal notice" rule is admittedly a high standard, there must come a point at which a court can say an individual has objectively demonstrated that he *knew* his

employment had been terminated.  Not surprisingly, there are few cases exhibiting facts similar to this, where an employee claims he was not aware of his termination.  However, the constructive discharge cases provide some level of guidance.  These cases discuss fact patterns involving hostile work environments and whether such environments are sufficiently hostile to cause the employee plaintiff to leave his employment.  *See, e.g.*, *Scott v. Lee Cnty Youth Dev. Ctr.*, 232 F. Supp. 2d 1289, 1292 n.1 (M.D. Ala. 2002).  Courts grapple with the decision of what date the alleged adverse employment action should be measured from, given that the adverse action typically occurs before actual termination.  *See id.* at 1294 (noting that in constructive discharge cases, "the employee has simply had enough and opts to quit his employment rather than continue working under the employer's conditions," so that "[a]lthough the date of the employee's resignation may be easily ascertainable, the actual timing of when the constructive discharge 'occurs' . . . is complicated . . . .").  Eventually, most courts choose the date of the employee's forced resignation for the definitive date of when the 180-day window begins.  *See id.* at 1295.  Similarly, this court chooses the date of Morris's filing for unemployment as the date from which he was on unequivocal notice of his termination.  *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998) ("The fact that the [date of accrual] is initiated by the employee . . . rather than by the employer directly does not change the fact that the employee has been discharged.").  Though it is not an entirely concrete analogy because there should be no question of whether an employee is on notice of tendering his own resignation, the difficulty of how to choose the

31

exact date of when an employee is unequivocally aware of an adverse employment action remains the same.

Precoat makes a convincing argument (and cites an applicable string of cases) that a plaintiff's failure to attend work and/or filing for unemployment benefits constitutes notice of termination.  (Doc. 34 at 19-20.)  And while this may not always be true in every case,[13] given the additional evidence discussed above, the court finds that the circumstances indicate Morris must have been on notice of his termination.  *See, e.g.*, *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136-37 (5th Cir. 1992) (where filing for unemployment was one factor in deciding the plaintiff had notice of the alleged discriminatory termination); *Makabin v. G4S Secure Solutions (USA), Inc.*, 3:10-CV-00441-FDW, 2011 WL 900155, at *4 (W.D.N.C. Mar. 11, 2011) *aff'd*, 448 F. App'x 389 (4th Cir. 2011) (noting that even if the plaintiff did not know he was receiving unemployment compensation, "the mere fact that [he] had . . . not attended work since August 2009 should have put him on reasonable notice of an actionable employment injury"); *Mesner v. Providence Hosp.*, 95-73753, 1996 WL 615917, at *4 (E.D. Mich. July 16, 1996) (observing how it is not possible for a plaintiff who does not contact his employer or try to return to work after an extended leave of absence to "still believe that he holds [a] position").

---

[13] As the Supreme Court noted in *Ricks*, each termination is different, and "[c]omplaints that employment termination resulted from discrimination can present widely varying circumstances. . . . The application of the general principles discussed [in *Ricks*] necessarily must be made on a case-by-case basis."  449 U.S. at 258 n.9.

To counteract Precoat's argument, Morris claims that he believed he was still employed by Precoat, but on leave, while he waited for the company to make its determination as to his future there.  (Doc. 50 at 19; doc. 38-2 ¶¶ 26, 28, 31, Morris Aff.)  He also claims that he would not have received unemployment benefits had he been terminated for job abandonment.  (Doc. 38-2 ¶ 36, Morris Aff.; doc. 50 at 19-20.)  However, a plaintiff's conclusory allegations are never enough to defeat summary judgment, *see Bennett*, 898 F.2d at 1533-34, and Morris provides no evidence for either of these assertions, other than his own beliefs, which the court simply cannot accept here given the other evidence Precoat has presented.  *See Anderson*, 477 U.S. at 256-57 (plaintiff must present affirmative evidence through specific facts to defeat summary judgment, even where his own state of mind is at issue).  And though Morris still had insurance at the time, the fact that he was not actually *paying* for it convinces the court that no reasonable jury could believe he was not on notice of his termination.[14]  This is especially the case where he had no explanation for his nonpayment, other than his claim that he did not think it was unusual

---

[14]   It is worth noting that Precoat cites *Bonham v. Dresser Industries Inc.*, 569 F.2d 187 (3d Cir. 1977) for the assertion that an "employer should not be penalized for providing severance pay or other extended benefits after the employment relationship has ended."  (Doc. 34 at 20.)  And while this may be the case, the court there was addressing a situation where there was no question of whether an employee had unequivocal notice of her termination, and it was faced with choosing whether to use the unequivocal notice standard or an alternate standard for the 180-day window to start running.  *Bonham*, 569 F.2d at 191-92.  In choosing the unequivocal notice standard, the court rationalized that it did not want to deter employers from giving "periodic severance pay or other extended benefits" to already terminated employees.  *Id.* at 191.  Here, however, where Morris has made an issue out of whether he got unequivocal notice at all, the receipt of the insurance benefits factors into determining whether he did indeed have knowledge of his termination.  Moreover, because Precoat claims that it inadvertently continued to provide Morris with benefits, the rationale behind the opinion would also not apply.

because he was waiting to hear about his status with the company. (Doc. 34-5 at 212, Morris Depo.) This explanation essentially operates as no explanation at all. *See Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.")

Finally, the common sense purpose behind unemployment compensation factors into the decision that Morris was on unequivocal notice. The legal definition of "unemployment" is "[t]he state or condition of not having a job even though available for work and perhaps seeking it." Black's Law Dictionary 1666 (9th ed. 2009). Moreover, Alabama courts have stated that the purpose of the unemployment-compensation law is "to provide a worker with funds to avoid a period of destitution after having *involuntarily lost his employment* and thus his income. It aids in sustaining him while he looks for other employment. . . . It is not a gratuity." *Arrow Co. v. State, Dept. of Indus. Relations*, 370 So. 2d 1013, 1015 (Ala. Civ. App. 1979) (emphasis added) (citing *Holmes v. Cook*, 236 So. 2d 352, 356 (Ala. Civ. App. 1970)). A plaintiff cannot simply stick his head in the sand to avoid the running of the filing deadline; at some point, circumstantial, objective evidence indicates his subjective awareness of his termination. In this case, the circumstances point toward September 14, 2008, as the relevant date. Therefore, Morris's termination claim is time-barred.

## B. Statute of Limitations

Because Morris's ADA discrimination claims are time-barred under the "unequivocal notice" standard, they must also be time-barred under the applicable statute of limitations.

34

In addition to the EEOC filing requirement, a plaintiff must comply with the statute of limitations for an action under the ADA. *See Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 550-51 (7th Cir. 1996). Federal courts adopt state statutes of limitations from the most analogous state claim when a federal statute does not provide one and the state statute is not inconsistent with federal law. *See id.* In doing so, the federal courts rely on a state's value judgment "concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 463-64 (1975).

The Eleventh Circuit has specifically addressed this issue and held that the ADA's statute of limitations is based on state limitations periods for personal injury actions. *Everett v. Cobb Cnty Sch. Dist.*, 138 F.3d 1407, 1409-10 (11th Cir. 1998). In Alabama, personal injury actions must be brought within two years of the alleged harm. Ala. Code § 6-2-38(l) (1975); *see also Hall v. Alabama*, 2:09-CV-342-MHT WO, 2010 WL 582076, at *5 (M.D. Ala. Feb. 18, 2010) (applying Alabama's two-year statute of limitations to an ADA case). However, though the state time limit is adopted, federal law still governs the date of a claim's accrual. *See Newcomb v. Ingle*, 827 F.2d 675, 678 (10th Cir. 1987) ("Federal law controls questions relating to accrual of federal causes of action."); *see also Everett*, 138 F.3d at 1409-10 (adopting Georgia's statute of limitations for an ADA claim, but following federal law as to date of accrual).

The date of accrual for the ADA statute of limitations varies slightly from the EEOC unequivocal notice filing requirement.  The general rule in federal courts is the "discovery rule" (namely, when a plaintiff knows or reasonably should know of the harm which is the basis of the action).  *See Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 588 (11th Cir. 1990) ("A federal claim is generally considered to accrue when the plaintiff knows or has reason to know of the injury which is the basis of the action."); *see also Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 (D.C. Cir. 1991) (discovery rule is general accrual rule in federal courts).  Because it focuses on whether the plaintiff had reason to know of the adverse employment action, it is a somewhat less stringent standard.  Nevertheless, in civil rights cases, the date of accrual has often been treated by courts as beginning on the same date that the EEOC filing 180-day window begins.  *See Ricks*, 449 U.S. at 258 (treating both the EEOC filing period and the applicable two-year statute of limitations as starting when the plaintiff had notice); *Everett*, 138 F.3d at 1410 (holding the statute of limitations begins when a plaintiff is "informed of the discriminatory act" and citing cases discussing EEOC filings and statutes of limitations interchangeably); *Kazanzas v. Walt Disney World Co.*, 704 F.2d 1527, 1528-29 (11th Cir. 1983) (stating that the statute of limitations begins to run when the cause of action accrues but citing cases from other jurisdictions stating the 180-day filing begins running at the same time as the statute of limitations).  This is because in most cases a plaintiff knows of the alleged discriminatory act when it occurs, so the statute of limitations and the EEOC filing date naturally coincide, despite the slightly different standards.  And

36

since this court has determined that Morris did have unequivocal notice of both his forced leave as of June 25, 2008, and his termination as of September 14, 2008, the outcome here is no different.  Thus, he would have had to file this lawsuit by June 25, 2010 (which he did not) in order to keep from being time-barred by the statute of limitations as to the forced leave claim, and by September 14, 2010 (which he did not) in order to keep from being time-barred as to the termination claim.

Furthermore, even if this court were to find Morris's various equitable tolling arguments addressed below persuasive, Morris makes absolutely no argument in his Opposition for tolling the statute of limitations.  (*See* doc. 50 at 23-32.)  Consequently, even if the court were to toll the 180-day limit for filing with the EEOC, Morris's ADA discrimination claims would be barred by the statute of limitations.  *See Kazanzas*, 704 F.2d at 1529 (noting tolling of statute of limitations and 180-day filing requirement must be analyzed separately).  Accordingly, the court finds that Morris's ADA discrimination claims are time-barred by both the EEOC filing deadline and the two-year statute of limitations.

## C.  Morris's Equitable Tolling and Waiver Arguments

The Supreme Court has held that equitable tolling is a remedy available to plaintiffs and that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  However, the Court has also cautioned that "such doctrines . . . are to

be applied sparingly." *Morgan*, 536 U.S. at 113.  Following these guidelines, the Eleventh Circuit has noted that equitable tolling is available only in extraordinary situations, such as where a plaintiff was intentionally misled by the defendant, had no way of discovering the wrong at an earlier time, or perhaps filed something procedurally defective but acted with due diligence.  *See Justice v. United States*, 6 F.3d 1474, 1479-80 (11th Cir. 1993). Importantly, the court emphasized that a plaintiff's due diligence was necessary, but not alone sufficient to qualify for equitable tolling.  *See id.* at 1479.

Morris sets forth a variety of arguments claiming equitable tolling and waiver of the EEOC filing requirement.  (Doc. 50 at 23-32.)  In particular, he argues that his claims should be equitably tolled because (1) he did not know of facts which would support an EEOC charge until February of 2009; (2) Precoat intentionally misled him into believing he had not been terminated; (3) he was in a car accident on February 18, 2009, preventing his timely filing; (4) Precoat would not be prejudiced; (5) Precoat waived the right to challenge the timely EEOC claim by not asserting it at the EEOC; and (6) Precoat waived the right to challenge timely filing by misrepresenting facts to the EEOC.  (Doc. 50 at 23-31.)  However, as noted earlier, he entirely neglects to address the overriding two-year statute of limitations. Therefore, even if this court were to find that Morris's time-barred claims should be equitably tolled for EEOC filing purposes, it would make no difference in the outcome. Moreover, as Precoat argues in its Reply, nearly all of the tolling and waiver arguments made by Morris are substantially without merit.  (Doc. 51 at 5-11.)

38

First, Morris was well aware of the facts underlying his lawsuit and even admitted that he thought he was being treated unfairly because of his Methadone use as of June 25, 2008. (Doc. 34-4 at 50, Morris Depo.)  This means that the unnecessary leave claim could not be tolled under the reasoning that Morris did not yet know of facts to support an EEOC charge because as of June 25, 2008, he knew he was being placed on leave and also suspected that it was because of his Methadone use.  Morris also stated that he believed he was being treated unfairly as of September 14, 2008. (Doc. 34-4 at 97-100, Morris Depo.) Just as with the unnecessary leave claim, the termination claim could not be tolled under the reasoning that Morris did not yet know of facts to support an EEOC charge because as of at least September 14, 2008, he knew he was terminated and suspected he was being discriminated against.  Given his own testimony suggesting his awareness, Morris is not entitled to equitable tolling on the ground that he had not yet discovered the alleged discrimination.  *Cf. Sturniolo*, 15 F.3d at 1026 (permitting equitable tolling where the plaintiff had no facts sufficient to support an age discrimination claim until he later discovered a younger individual had replaced him).

Furthermore, the arguments that (1) Precoat intentionally misled Morris and (2) Precoat would not be prejudiced if Morris were permitted equitable tolling are also unconvincing.  First, Morris cites no authority for the notion that equitable tolling is permissible when a defendant misleads a plaintiff.  And while tolling is, in fact, permissible

in such a case,[15] *see Justice*, 6 F.3d at 1479, it should only be applied sparingly, *see Morgan*, 536 U.S. at 113, and Morris gives no facts sufficient to convince the court that he was intentionally misled by Precoat.  Second, Morris himself admits that the absence of prejudice to a defendant is only one factor in determining whether to toll the filing deadline, but is not an "independent basis for invoking the doctrine."  *Meckes v. Reynolds Metals Co.*, 604 F. Supp. 598, 606 (N.D. Ala. 1985); (doc. 50 at 27.)  Because all of his other tolling arguments fail, the alleged absence of prejudice alone would not be enough to justify tolling.[16]

Of all of the equitable tolling arguments Morris asserts, the fact that he was in a car accident rendering him disabled the day after he first met with an attorney is the most facially persuasive.   (Doc. 38-2 ¶¶ 39-41, Morris Aff.)   However, this, too, is ultimately unsatisfactory.  As Precoat points out, Morris's Affidavit says he was in the hospital for six weeks, (doc. 38-2 ¶ 40), while his deposition testimony evidences that he was in the hospital from February 18, 2009, until March 2, 2009: a total of twelve days, (doc. 34-4 at 125, Morris Depo.).[17]

Moreover, Morris has made no showing of due diligence.  *See Justice*, 6 F.3d at 1479-80.  If the definitive date of unequivocal notice had been February of 2009, the court could

---

[15]  It would, however, be more appropriately deemed equitable estoppel.  *See Kazanzas*, 704 F.2d at 1532 (discussing what conduct goes far enough to justify equitable estoppel, and noting the "crucial elements [are] fraud or misrepresentation").

[16]  It is also worth noting that Precoat disputes Morris's allegations that it would not be prejudiced by claiming it can produce evidence on the issue if necessary.  (Doc. 51 at 8 n.4.)

[17]  During oral argument on Precoat's Motion, Morris's counsel conceded that Morris's deposition testimony was correct on this issue.

40

perhaps believe that Morris did act with due diligence without any additional evidence.  This would indicate that he discovered his claims, immediately saw an attorney, got in an accident, and then filed his EEOC charge right away.  But of course, in such a scenario, tolling would not even be necessary because Morris's claims would be timely.  However, because Morris had notice of his termination as of September 14, 2008, he should have presented the court with some indication that he acted with due diligence in order to justify tolling.  He has given the court no reason as to why he did not contact an attorney or file a claim from September of 2008 until his car accident; therefore, tolling is not an appropriate remedy.  *See Broderick v. Astrue*, 2:10-CV-903-WKW, 2011 WL 1546168, at *2 (M.D. Ala. Apr. 25, 2011) ("[A] sudden medical emergency is certainly beyond the control of the claimant, [but] the circumstances here are not such that a late filing was 'unavoidable even with diligence.'" (quoting *Jackson v. Astrue,* 506 F.3d 1349, 1355 (11th Cir. 2007))).

In addition, as Precoat observes, the Eleventh Circuit has not addressed the issue of tolling in civil rights cases when a plaintiff is incapacitated.  *Baker v. Principi*, CIV.A. 3:04CV574-T, 2005 WL 1366473, at *2 (M.D. Ala. May 24, 2005).  It has, however, noted that "[e]quitable tolling is appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Jackson*, 506 F.3d at 1355 (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999)) (internal quotation marks omitted).  Thus, while it would seem appropriate to allow equitable tolling in certain instances of total physical incapacitation, there is no indication

41

that this is such a case.  *See, e.g.*, *Baker*, 2005 WL 1366473, at *3 ("[I]t was Baker's own

lack of diligence that caused her Title VII complaint to be untimely, rather than any physical

or mental incapacitation.").

Finally, Morris's waiver arguments are also not persuasive.  Again, Morris cites no

authority for the proposition that failure to raise an issue at the EEOC constitutes waiver of

the argument.  (Doc. 50 at 28.)  Conversely, this court has uncovered case law that stands for

the exact opposite proposition.  *See, e.g.*, *Cook v. Union Camp Corp.*, CIV. A.1:95CV140-S-

D, 1996 WL 407549, *3 (N.D. Miss. Apr. 4, 1996) (holding that a defendant's failure to raise

timeliness issue at EEOC did not waive the argument); *Byrnes v. Herion, Inc.*, 757 F. Supp.

648, 653 (W.D. Pa. 1990) (same); *see also, e.g.*, *Bruce v. U.S. Dep't of Justice*, 314 F.3d 71,

74 (2d Cir. 2002) (holding that an agency only waives a timeliness objection if it makes an

express finding of timeliness; otherwise, the objection is not waived); *Boyd v. U.S. Postal

Serv.*, 752 F.2d 410, 414 (9th Cir. 1985) ("The mere receipt and investigation of a complaint

does not waive objection to a complainant's failure to comply with the original filing time

limit . . . .").  Morris also argues that Precoat waived the ability to challenge the timely filing

of his EEOC charge because it misrepresented facts at the EEOC.  The court agrees with

Precoat that Morris is "disputing the characterization or phrasing of the facts," and yet again,

Morris has cited no legal authority for his claims.  Thus, while waiver could potentially be

appropriate in certain cases, this is not one of them.

## D.  Governing Law

Even though Morris's claims are time-barred, in the alternative, they are also barred under the merits of the ADA.  However, to get to the merits of his claims, the court must first determine which law governs this action.  In 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA").  *See Powers v. USF Holland, Inc.,* 667 F.3d 815, 823 n.7 (7th Cir. 2011).  On January 1, 2009, the ADAAA became effective.  *See* ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008); *see also Harty v. City of Sanford*, 6:11-CV-1041-ORL-31, 2012 WL 3243282, at *4 (M.D. Fla. Aug. 8, 2012).  Importantly, the changes to the ADA alter the definition of disability so that it is "construed in favor of broad coverage of individuals under this chapter."  42 U.S.C. § 12102(4)(A).  Practically, the amendments act to make "[t]he primary object of attention in cases brought under the ADA . . . whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability," which "should not demand extensive analysis."  29 C.F.R. § 1630.1(c)(4).  Given these substantial and relevant changes, the parties understandably disagree on whether the ADA or the ADAAA governs this case.  (*See* doc. 34 at 20-21; doc. 50 at 32-33.)  The ADAAA has almost uniformly (if not completely) been held not to operate retroactively by federal courts across the nation.  *See Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 762 n.9 (11th Cir. 2011) ("[T]his court has never held that the ADAAA is retroactively applicable.  Other circuits have concluded that the amendments are not retroactively applicable.").  Therefore, in order to determine whether the

ADA or the ADAAA governs this case, "we look to the [statute] . . . in effect at the time of the alleged discrimination." *Fikes v. Wal-Mart, Inc.*, 322 F. App'x 882, 883 n.1 (11th Cir. 2009).

In addition to claiming he did not know when he was terminated, Morris attempts to create an issue of fact as to the *actual date* he was terminated in order to have a chance at a more favorable law. Morris argues that the ADAAA governs this case because the termination of his employment did not occur until after January 1, 2009. (Doc. 50 at 32.) Conversely, Precoat argues that the ADA governs because all of the alleged discriminatory events occurred before January 1, 2009. (Doc. 34 at 20.) Given the evidence before the court, it finds as a matter of law that the ADA applies to Morris's case because he has failed to create an issue of material fact as to whether he was actually terminated on September 1, 2008.

Morris argues that he never received the August 22, 2008, letter Louie claims to have sent, and that a reasonable jury could find that it was not sent. (Doc. 50 at 19, 36.) However, when one party offers evidence of a mailed letter, the other party cannot rebut the presumption that it was sent by alleging that it was never *received*. *See Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238-39 (11th Cir. 2002) (finding an inference that a letter was sent where there was a copy of the letter and postage paid, and holding that a statement the letter was never received did not rebut the presumption that it was sent). Precoat provided a copy of the August 22, 2008, letter, along with Louie's testimony that she

44

paid postage and sent it to Morris personally.  (Doc. 34-32, Aug. 22, 2008, Letter; doc. 34-11 at 43, Louie Depo.)  Morris's testimony that he never received the letter cannot rebut the inference that it was *sent* by Precoat, and he has no additional evidence to prove that it was not.  Therefore, the August 22, 2008, letter, stating that if Morris did not respond in seven days he would be terminated, supports Precoat's claim that he was in fact terminated on September 1, 2008.  Moreover, even *if* the letter was never sent by Precoat, this only goes to Morris's notice of his termination, not his actual termination date.   The letter's existence—unless Precoat created it in 2009 as part of an elaborate cover-up effort—supports the fact that as far as the company was concerned, Morris was terminated as of September 1, 2008.  (*See* doc. 34-32, Aug. 22, 2008, Letter.)

In support of his argument that he was not terminated at the time Precoat claims, Morris also attempts to rely on his own termination sheet, claiming that a reasonable jury could believe that Precoat had attempted to hide the date Morris's termination was entered into its computerized employee database.  (Doc. 50 at 20.)  It is true that Morris's termination sheet does not have a date of entry of termination on it, though it does show the "effective date" of termination as September 1, 2008.  (Doc. 39-16, Morris Termination Sheet.)  Morris compares his termination sheet to employees who he claims also kept receiving insurance benefits after they were allegedly terminated, pointing out that their sheets contain the date of entry, while his does not.  (*See* doc. 50 at 20-21; doc. 39-8, Termination Sheets.)   Not only is this not incredibly persuasive, but it is also factually inaccurate.  As noted earlier,

Precoat's counsel stated at oral argument that the termination sheets provided by Morris were from prior Precoat employees who had also been terminated for job abandonment, not who had accidentally retained insurance benefits. Plaintiff's counsel did not dispute this assertion. In addition, the fact that there is no date of entry on Morris's termination sheet does not create a question of fact as to Morris's termination date because Precoat could have easily explained away a late date of entry by claiming it had terminated Morris on September 1, 2008, but neglected to enter it into the system at the time (also providing support for why he had inadvertently retained insurance). Consequently, looking at matters logically, Precoat had no motivation to affirmatively hide the date that Morris's termination date was entered into the computer. Moreover, the fact that there were actually other employees who also received insurance benefits after their effective dates of termination cautions against giving too much weight to Morris's argument. (*See* doc. 34-12 at 359, Louie Depo.; doc 34-3 ¶ 13, Louie Aff.; doc. 34-36, Cancellation of Health Insurance Forms; doc. 34-35, Termination Sheets.) It corroborates Precoat's contention that it unintentionally continued to provide Morris with insurance though he had been terminated—a claim which might look more suspect had it been only Morris alone still receiving benefits.

In conclusion, there is no evidence before the court that there was an elaborate scheme on Precoat's part to somehow create a fake letter dated August 22, 2008, and retroactively enter Morris's termination date into its computer system, while purposefully hiding the entry date. The company's records should control when Morris was actually terminated, absent

46

some evidence on which a reasonable jury could find that they are untrustworthy or that Precoat had a motivation to alter Morris's termination date.  *See, e.g.*, Fed. R. Evid. 803(6)(E) (allowing business records into evidence as a hearsay exception so long as "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness").   Moreover, Morris had clearance to work from both the company's physician and his own.  (Doc. 34-12 at 289-90, Louie Depo.; doc. 39-12, Aug. 5, 2008, E-mail.)  Morris has offered no evidence why Precoat would allow his employment to continue until 2009, though it was no longer deliberating on whether he was capable of working, (doc. 34-12 at 299-300, Louie Depo.), he was not physically working, (doc. 34-4 at 62, Morris Depo.), he was not being paid, (doc. 34-11 at 142, Louie Depo.), and he was not paying for his own insurance.  (Doc. 34-5 at 212, Morris Depo.)  All of the evidence points toward Morris's termination having occurred on September 1, 2008; no reasonable jury could believe otherwise.  *Scott*, 550 U.S. at 380 (stating that if no reasonable jury could believe one parties' version of the facts then court should not adopt that version on summary judgment).[18]

 Therefore, because this court finds that all of the alleged discriminatory conduct occurred before January 1, 2009,[19] the ADA applies as a matter of law.

_____

[18]  As discussed earlier in this opinion, the court finds as a matter of law that Morris had unequivocal notice of his termination no later than September 14, 2008, when he applied for unemployment benefits.

[19]  Precoat is correct in its assertion that the later cancellation of insurance benefits does not constitute any independent discriminatory action, (doc. 51 at 10), and therefore, it does not change the court's conclusion.  *See Ricks*, 449 U.S. at 258 (actual adverse employment decision was made upon denial of tenure, even though one of the effects of the decision did not occur until later).  Morris's loss of insurance benefits was simply a later consequence of the earlier

**E.  Merits of ADA Discrimination Claims**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  An ADA plaintiff may prove a discrimination claim by presenting direct evidence of discrimination or through the use of circumstantial evidence.  *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1420 (M.D. Ala. 1996) (citations omitted).  Because Morris has not argued that there is any direct evidence, the court proceeds under the burden-shifting framework originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  However, there is no need to proceed throughout the entire burden-shifting analysis, because Morris fails on the first step of his prima facie case.

**1. Unnecessary Medical Leave and Termination Claims**

The employee bears the burden of establishing a prima facie case of disability discrimination by a preponderance of the evidence.  *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *Reed v. Heil Co.*, 206 F.3d 1055, 1063 (11th Cir. 2000).  To meet this burden, Morris must prove (1) he has a disability; (2) he is otherwise qualified to perform the essential functions of the job; and (3) he was subjected to unlawful discrimination because of his disability.  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002); *Davis*, 205 F.3d at 1305.  Precoat disputes the first and third prima facie

termination.

48

elements, arguing that Morris is not disabled and did not suffer adverse employment action because of his disability.  (Doc. 34 at 21.)  Because the court finds that Morris is not disabled under the first step of this test, it need not reach the second two parts.

Under the ADA, "disability" is defined as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarding as having such an impairment."  42 U.S.C. § 12102(1).  Morris argues only that he was "regarded as" disabled by Precoat, qualifying under the third possible definition of a disability.  (Doc. 1 ¶ 55.)  The "regarded as" prong holds that a plaintiff is disabled if his employer perceives him as having an ADA-qualifying disability, even if there is no factual basis for that perception.  *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004) (citations omitted).  The perceived impairment must be one that, if real, would substantially limit a major life activity of the individual.  *Id.* (citations omitted).  In order "for a plaintiff to prevail under this theory, he must show two things: (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is 'substantially limiting' and significant."  *Rossbach v. City of Miami*, 371 F.3d 1354, 1360 (11th Cir. 2004) (citing *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999)).

Morris only claims in his Complaint that he was perceived as having a disability, which substantially limits a major life activity.  (Doc. 1 ¶ 52.)  Later, in his Opposition, he expands upon the allegation by stating that Precoat perceived his impairment as substantially

49

limiting his major life activities of "working, walking, sleeping, talking, and thinking." (Doc. 50 at 36.)  He supports this allegation by stating that Precoat's original incident report stating that he was "confused," "swaying," and "shouting," "suggests" that Precoat perceived him as substantially limited in these various ways.  (Doc. 50 at 35-36; doc 34-15, Recording Form Observed Behavior Determining Reasonable Cause.)

The court finds that this one incident does not indicate Precoat regarded Morris as substantially limited in these major life activities.  Because the actual incident occurred before Precoat even knew Morris was taking medication, much less which kind, (doc. 34-16, Rob Nemeth's June 13, 2008, Notes), it cannot be contended that at that point in time, Precoat regarded Morris as disabled and substantially limited as to working, walking, sleeping, talking, and thinking because of his Methadone use.  In addition, once Precoat did learn that Morris was taking medication, there is evidence that it still was not told what kind of medication until nearly two weeks after this first incident.  (Doc. 34-16, Rob Nemeth's June 13, 2008, Notes; doc. 38-21, June 24, 2008, E-mail; 34-4 at 18, Morris Depo.) Therefore, even if Precoat had been concerned about Morris's Methadone use, there is little basis for saying that it linked this one incident to his prescription.  In fact, Precoat allowed Morris to return to work after the incident, once he had tested negative for illegal drugs. (Doc. 34-4 at 27-29, Morris Depo.)  While certainly the fact that Morris was taking medication showed up on Precoat's radar as of the June 13, 2008, meeting, there is no evidence to indicate it perceived the incident as having been caused by his prescription.

Moreover, if Precoat at that point thought Morris was on drugs or alcohol (explaining why it sent him to have a drug test, (doc. 38-3 at 18-19, Nemeth Depo.)), there is a distinct difference between regarding someone as disabled and believing he or she is impaired on one occasion because of drug use. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 185 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008) ("The impairment's impact must also be permanent or long term.")[20] Because this is the only argument Morris makes as to walking, sleeping, talking, and thinking, the court will focus on whether he was regarded as substantially limited in working.

To the extent that Morris argues Precoat regarded him as substantially limited in his major life activity of working, this argument also fails. Under the ADA, when the major life activity at issue is that of working, the plaintiff must show that he is unable to perform either a class of jobs or a broad range of jobs in various classes. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008). A plaintiff asserting he is "regarded as" disabled must therefore show that his employer regarded him as having an impairment substantially limiting his ability to perform a broad range of jobs, rather than a single position. *Id.* Moreover, an employer's safety concerns do not necessarily indicate that it perceives an employee as substantially limited in working. *See, e.g.*, *Krocka*

---

[20] Even under the ADAAA, a perceived disability claim may not be based on an impairment that is "transitory and minor," meaning having "an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

*v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) (noting that where medical inquiries are prompted by concern with employee safety, the employer may in certain circumstances require medical information); *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993) ("An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general.")

In his Opposition, Morris argues that Precoat regarded him as substantially limited in working "in any manufacturing plant" because it would not allow him to return to work after his doctor cleared him.  (Doc. 50 at 35.)  Precoat asserts in its Reply that Morris mainly argues he was regarded as disabled because Precoat perceived him as unable to perform the essential functions of a coater operator.  (Doc. 51 at 11.)  There was substantial testimony and other evidence supporting the notion that Precoat was concerned for both Morris's safety and the safety of others around him.  (Doc. 38-16, June 21, 2008, E-mail; doc. 34-4 at 171, Morris Depo.; doc. 38-8 at 25, Birnmann Depo.; doc. 34-16, Rob Nemeth's June 13, 2008, Notes; doc. 34-11 at 117, 147-48, 158, Louie Depo.; doc. 34-21 at 48-49, Christopher Depo.) Furthermore, Precoat's job description for a coater operator contains several references to potentially dangerous job requirements.  (Doc. 34-8 at 1-3, Coater Operator Job Description.) In addition, the ADA allows medical "inquiries" when it "is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112 (d)(4)(A).  Finally, Precoat's Handbook reserves the right to get an independent opinion from a company-selected

52

physician.  (Doc. 34-23 at 8, Precoat's Handbook.)  Given all of this, the court finds that no genuine issue of material fact exists on the issue of whether Precoat regarded Morris as substantially limited in the life activity of working.

First, the evidence reveals that Precoat was concerned with evaluating whether Morris could work safely; there is no indication that it considered Morris substantially limited in performing tasks in his *own* manufacturing job, much less any other manufacturing jobs.  In fact, Morris has pointed to no evidence that Precoat viewed him as limited at all in his position, which would mean he was certainly not regarded as substantially limited.  *See, e.g.*, *Kemp v. Holder*, 610 F.3d 231, 237 (5th Cir. 2010) (summary judgment granted because employee "has produced no evidence in support of [his] claim" that employer had "broad misconceptions" as to the major life activities of hearing and working); *Deas v. River W., L.P.*, 152 F.3d 471, 481-82 (5th Cir. 1998) (summary judgment granted where there was no evidence that employers regarded plaintiff as substantially limited); *see also Krocka*, 203 F.3d at 514 ("Employers do not run afoul of the ADA when they make employment decisions based on physical or mental characteristics that are not impairments or that are 'limiting, but not substantially limiting.'" (quoting *Sutton*, 527 U.S. at 491)).  Precoat wanted a physician's evaluation to be sure that Morris could safely work, (doc. 34-11 at 150-53, Louie Depo.), and it was well within its authority to have its own physician issue a second opinion.  *See* § 12112 (d)(4)(A); (Doc. 34-23 at 8, Precoat's Handbook.)  Once it got its doctor's approval, it attempted to contact Morris to start the process of returning him to work, (doc. 34-32, Aug.

53

22, 2008, Letter), supporting the notion that it did not perceive him as either limited or substantially limited in any way whatsoever.

Second, the job description for a coater operator had specific requirements that Precoat was understandably concerned about, including Dr. Lupinacci's concerns that the DOT has a regulation against drivers taking Methadone. (Doc. 34-8 at 1-3, Coater Operator Job Description; doc. 34-30, Aug. 4, 2008, E-mail.) So, even if it could be argued that Precoat perceived Morris as limited in this position because it did not let him return to work immediately after his own doctor's approval, there is no evidence on which a reasonable jury could find that the perception extended farther than his own position. This, in fact, is similar in many respects to the example Morris cites, *Rossbach v. City of Miami*, which held that by being placed on light duty, police officers were *not* regarded as substantially limited in working because it was "too narrow a range of jobs to constitute a 'class of jobs.'" 371 F.3d at 1361-62 (citations omitted). Moreover, while the duties of a police officer are likely to remain similar no matter the employer, the duties of coater operator are even more specific; they certainly do not translate to the duties in "any manufacturing plant," (doc. 50 at 35), which could range from a desk job to maintenance to machine assembly. Because the evidence before the court suggests that Precoat was only concerned with safety due to the risks inherent in the specific coater operator position, (*see* doc. 34-8 at 1-3, Coater Operator Job Description), no reasonable jury could find that Precoat considered Morris substantially limited in performing a broad range of jobs, as he contends. *See Sutton*, 527 U.S. at 491; *see*

*also, e.g.*, *Beason v. United Technologies Corp.*, 213 F. Supp. 2d 103, 115 (D. Conn. 2002)

*aff'd*, 337 F.3d 271 (2d Cir. 2003) (holding that where plaintiff presented "no evidence of

the specific job market in the geographic area to which he had reasonable access" or of the

"general employment demographics and/or of recognized occupational classifications," no

reasonable juror could conclude he was perceived as substantially limited in his ability to

perform a broad range or class of jobs).

     Precoat prudently used its discretion to inquire into Morris's medical state and get a

company physician's approval before returning him to work.  *See* § 12112 (d)(4)(A); (doc.

34-23 at 8, Precoat's Handbook.)  Accordingly, because there is no evidence that Precoat

perceived Morris as substantially limited in the major life activity of working, the court holds

that Morris was not "regarded as" disabled by Precoat under the ADA.  Since the court finds

that Morris cannot prove that he was disabled under the "regarded as" definition of disability

under the ADA, it need not examine the remaining elements of Morris's prima facie case of

disability discrimination.  Because Morris has not met his burden of providing sufficient

evidence to show that he was disabled while employed at Precoat, he has failed to meet his

burden of establishing a prima facie case of disability discrimination.  Consequently, even

if Morris's claims were not time-barred, Precoat would be entitled to judgment as a matter

of law on the merits of Morris's ADA claims.

### 2.   Retaliation and Failure to Accommodate Claims

Next, Morris's retaliation claim, his third claim of discrimination under the ADA, is not entirely clear.  The prohibition against retaliation in the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Morris originally alleged in his Complaint that Precoat terminated him after he complained about not being able to return to work because he was regarded as having a disability.  (Doc. 1 ¶ 56.)  However, in order to make an ADA retaliation claim, a plaintiff must prove that: "(1) he 'engaged in conduct protected by the ADA'; (2) he 'was subjected to an adverse employment action at the time, or after the protected conduct took place' and (3) the defendant 'took an adverse employment action against [him] because of [his] protected conduct.'" *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1158 (11th Cir. 2005) (quoting 3C Fed. Jury Prac. & Instructions § 172.24 (5th ed.)).  Once Precoat pointed this out in its Motion for Summary Judgment and observed that there is "no authority" for the proposition that Morris engaged in protected activity by being regarded as having a disability, (doc. 34 at 25), Morris changed his argument entirely.  Now, Morris argues in his Opposition that Precoat's failure to provide him with a reasonable accommodation for his impairment is the protected activity under the ADA.  (Doc. 50 at 37-38.)  He claims that his request for accommodation was asking to be allowed to take

Methadone while working, but Precoat did not grant the request and terminated him because of it.  (*Id.*)

There is some authority for the fact that a failure to accommodate claim is considered "protected activity" under the ADA, and that it can therefore be subject to a retaliation claim. *See, e.g.*, *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) ("[I]t would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge. This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation." (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997))).  However, this claim simply cannot stand.  Not only did Morris fail to allege that failure to accommodate was the protected activity in his Complaint, but he also alleged *repeatedly* that he had not been in need of any accommodations.  (Doc. 1 ¶¶ 17, 53, 56.)  Because "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment," *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), Morris's retaliation claim fails. Likewise, because Morris only now, at the summary judgment stage, alleges an independent failure to accommodate claim, this claim also fails as a matter of law.[21]  *See id.* ("Liberal

---

[21]  It is also worth noting that though under the ADA the Eleventh Circuit had concluded that there is a duty to accommodate an individual who is "regarded as" having a disability, *see D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1240 (11th Cir. 2005), when Congress enacted the ADAAA, it changed this standard.  Therefore, even if his case had been governed by the ADAAA, and even if he had been regarded as having a disability, Morris's failure to accommodate claim would fail for yet another reason because "the ADAAA clarified that an

pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint. The proper procedure . . . to assert a new . . . claim [is] to seek to amend [the] complaint.").

## F.  Alabama Law Negligence Claim

To establish a claim of negligence under Alabama law, "a plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Jones Food Co., Inc. v. Shipman*, 981 So. 2d 355, 361 (Ala. 2006) (quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (internal quotation marks omitted)).  Morris alleges in his Complaint that Precoat was under a duty to "inform [him] that his employment would be terminated if he did not contact Louie within the next seven days." (Doc. 1 ¶ 65.)  Much as with his retaliation claim, once Precoat asserted in its Motion for Summary Judgment that there is no authority to support such a proposition, (doc. 34 at 28), Morris changed his entire claim in his Opposition.  Now, Morris instead asserts a negligent supervision claim, alleging that Precoat had a duty to reasonably supervise its employees.  (Doc. 50 at 38-40.)

Again, it is not permissible that a plaintiff add new claims by way of a brief opposing summary judgment; rather, a plaintiff must amend her complaint to add new claims. *Gilmour*, 382 F.3d at 1315.  The very purpose of notice pleading is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v.*

---

individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.'" *Powers*, 667 F.3d at 823 n.7 (citing 42 U.S.C. 12201(h)).

*Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957) (citations omitted)).  And under Alabama law, "a plaintiff will not be permitted to count on a specific duty and its breach and recover by proving the breach of another duty." *Louisville & N.R. Co. v. Johns*, 63 So. 2d 574, 578 (1953).  Finally, the Alabama Supreme Court has made clear that a negligent supervision claim is an independent cause of action in Alabama. *See Lane v. Cent. Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983) ("[T]his Court recognizes a cause of action against the master based upon the incompetence of the servant.")

By attempting to add a completely new negligent supervision claim through his Opposition, Morris has given Precoat absolutely no notice of the claim as the Federal Rules of Civil Procedure require.  *See* Fed. R. Civ. P. 8(a)(2).  Moreover, Morris has alleged one specific duty—Precoat's supposed duty to inform him of his termination—yet now relies on another.  Attempting to slip a new claim in the back door by disguising one claim as another is not permissible.  Therefore, Morris's claim of negligence under Alabama state law fails, and Precoat is entitled to judgment as a matter of law.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that Precoat's Motion for Summary Judgment, (doc. 34), is due to be granted with respect to all claims.  An order granting Precoat's Motion will be entered contemporaneously with this opinion.

**DONE**, this 27th day of September, 2012.

SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE